I'm Sheila Campbell and I'm the attorney for the appellant Winfred Beasley. Mr. Beasley brings this employment discrimination case based upon an allegation that he was discriminated on the basis of his race. Mr. Beasley was hired in 2012 as the quality manager for the appellee Warren Unilube. There was a symbiotic relationship between the quality control manager, the production manager, and the lending manager. All of these managers had to work together in collaboration with each other to put out a quality product. There was no indication that Mr. Beasley did not implement plans, procedures, processes to produce a quality product. But the plans, procedures, and directives that were given to production were not followed by the production manager. In June of 2015, the production manager was put on a performance improvement program, a PIP program, for 90 days. Obviously, if Mr. Beasley and Mr. Rusty Brown were working in collaboration with each other to put out a product, if the production manager's leadership failed and he did not drive home with his production crew that they had to follow the quality control procedures that had been put into place by Mr. Beasley, then their conduct was imputed to Mr. Beasley. But according to Mr. Brown, once the performance improvement program was put into place, in 30 days he had turned around production, he had turned around shipping, and all of the products were going out without any defect. He agreed that if that occurred, then that meant that he was following the quality procedures that were put into place by Mr. Beasley. Mr. Beasley was never afforded a performance improvement program. He was terminated on August 7th of 2015. At that time, there were no complaints from any customers. There were no defects in the product. There were no reason to terminate him from his employment. Well, you know, one thing that becomes clear is prior to that period you're talking about, they were threatening to take, I don't know exactly what that is, but the ISO certification away, which is the certification that's pretty significant, that customers would have left the company and not bought their products, there was defective oil, there was funny smelling oil, there was mislabeled products, all of that was going on. Your Honor, I certainly can address that. In 2012, 2013, 2014, there were no complaints. In 2015, the company had not put a procedure in for determining if oil had a specific smell. They went on vacation during the Thanksgiving holidays. They left the temperature up too high, which was a procedure that was related to blending of the oil, and because of the barrels that the oil were in, they developed this pungent smell. The blending department approved this oil to go out because they said that they had never put in place a procedure. It was the responsibility of the vice president of quality to develop this procedure, and after they found out that the particular oils that they had left the oil in over the Thanksgiving holiday had caused this problem. It was a one-time problem. Nobody suspected it, and so therefore, Mr. Beasley is not responsible for the blending of the oil. But didn't the ISO auditor specifically criticize your client's capabilities and suggest that the auditor didn't think he was ever going to be able to do the job that he was hired to do? And in the context of the other issues that were going on, isn't that relevant? And I submit, Your Honor, that that was hearsay. They did not obtain any type of affidavit from the auditor, and the auditor passed their ISO qualifications every year, and he only pointed out four minor deficiencies, which did not even rise to the level of a major deficiency. So they were not ever in jeopardy of losing their ISO qualifications, and the trial court indicated in its decision that the affilee had lost AutoZone's business. That is patently untrue. They never lost any business from AutoZone, from Advance, from Request. So that's a flaw error in the decision. You mentioned Rusty Brown, the production manager, and you used him as a comparator for purposes of proving the claim under McDonnell Douglas, but one of the differences, you got a few differences, and I'm hoping you can address each of them, or address them together. One is, he had been in the industry for, I don't know, 30 years, and he had also been with the company for 20-some years, so that makes him different than your client who was there, I think, three years. He also wasn't primarily responsible for quality control. You're absolutely right, he was responsible for production, and there may be a link there, certainly, but the fact that he wasn't primarily responsible for the quality control, and your client was, makes him sort of a different animal when there were quality control problems happening. So, I'm just trying to figure out how to deal with those facts. Well, I don't think in a manufacturing setting you can isolate the production manager from the quality control manager, because the quality control manager is not out on the production line looking at every product. He sets into place or achieves quality, and because Mr. Brown refused to implement these procedures, and he implemented corrective action to make sure the quality product, that's why he was put on a performance improvement program. And not only that, for 30 years, this company upheld this incompetent white man, and kept moving him from place to place to place to protect his income. And that certainly can't be fair to an African-American that comes in with a degree in engineering, which puts into place these processes, brings in new technology to cut down on the errors, and yet this production manager gets a 90-day improvement program, and they have been upholding his incompetence for 30 years. I mean, how would my client ever overcome 30 years of supporting this white man who was incompetent? I don't understand how that would ever happen. And they admit they moved him from place to place for 30 years. And we believe that there is the proper comparison, because but for Mr. Brown not upholding his position in implementing these procedures that Mr. Beasley had put into place, my client would not have any deficiencies. And Mr. Brown said he cleared up the deficiencies within 30 days. So as of 7-19 of 2015, all the deficiencies had been cleared up, so there was no justification for terminating Mr. Beasley on 8-7, unless it was pretext for discrimination. May it please the court, I'm Bill Frye. I'm here on behalf of Warren Uniloo. Warren manufactures oil, and part of our job is to put the oil into containers for customers like AutoZone and Family Dollar and places like that for them to sell to other customers. So it's extremely important that these items be done correctly. Now, one of the things I want to address right away about the smelly oil, there was some smelly oil and some problems with the oil. That was brought up for that by Mr. Eastock, who was the vice president, and that was not part of the reason that he was eventually terminated. So what was the reason then? I mean, the mislabeling? I mean, was that part of it? What exactly caused his termination, in your view? Sure. Well, let me go back and give a little history as to what happened. In 2015, I know that Ms. Campbell said that we didn't lose AutoZone. Oh, yes, we did. We lost our major client because of quality control problems. So what did Mr. Eastock and Mr. Riley, who's the other vice president, do? They wrote up almost everybody in management. Mr. Beasley was not the only person who received discipline in this matter. Matter of fact, there were five managers they were written up. In addition to Mr. Beasley, Mr. Moore, who was terminated about the same time as Mr. Beasley for job performance as well. Now, a lot of the other managers were simply given reprimands. Some of them were demoted. Some of them were not. But there were only two managers that were terminated, one Caucasian and one an African American. The reason for his termination, the first one was what was mentioned earlier, ISO certification. If we don't have that ISO certification, then we can't operate our plant. We lose our certificate. We might as well shut the doors. Well, a suggestion was made that you weren't close to losing that and that there were four, I think counsel indicated, four minor infractions. Would you respond to that? Sure. There were actually six. And in the depositions of the witnesses, the witness mentioned major violations, but he was going ahead and giving us an opportunity to fix the problem so that we could keep our certification. This was the first time we'd ever had an ISO certification where we failed the initial audit. And it was under Mr. Beasley's watch. Now, that was just one of the items. The major item for the reason that he was eventually terminated is his job as quality manager is he's our last line of defense. He is ultimately the person who is responsible to make sure that no defective product gets removed. Ms. Campbell said that once he was made aware of the problems with the discipline or whatever, things were corrected, and then he was fired. That's not correct because Mr. Eastock testified he continued to receive complaints. Also, in Mr. Eastock's deposition, he was asked what was the basis of the termination, and he said that he audited the material, he visited with Mr. Beasley's workers and other people under him and made the determination that he was not progressing as they had hoped. I think also the district court pointed out that they also made a determination that he did not have his must experience in the oil industry and was very slow to change. And this was a very dire situation because we, as we said, we had one client, AutoZone, that was already walked out the door, and we had two others, our two major competitors or clients that were about to walk out the door that were buying oil from us. They don't just buy oil from us. They buy from other distributors as well. And a lot of times we don't even know that they're dissatisfied. They just quit sending us orders. But in this particular situation, they actually let us know, hey, we've got a problem. And the problems were with the capping, with the wrong labels going out. We would have an AutoZone order that would go out with another company's logo on it, and it would be shipped to them. And this continued on and continued on and continued on. She was mentioning Rusty Brown. And also, just I want to point out, Billy Moore was the other manager who was written up at the same time and was terminated. Also, as far as Rusty Brown, this gentleman's worked there for 30 years. He worked in every department. And as the district court pointed out, Mr. Eastock said, I'm trying, I was trying to find another place for him. It didn't have anything to do with any racial animus or anything like that. He had worked in almost every area of the plant. He knew the plant like the back of his hand. So he's a valuable employee. He was not in a position that he was doing well in. We've seen he'd been to a different place to work. He was also Yes. Counsel, opposing counsel made the point that, you know, the company was trying to protect this employee. I didn't see, you know, that he'd been competent for 30 years. I did not see that in the record. But I want to give you a chance to Rusty Brown has been a very valued employee. He, like I said, is very valuable. By the way, he's worked for that plant for 30 years. He wasn't not just in the oil industry for 30 for 30 years. He's worked at that plant. He knows every nook and cranny of that plant. So if anyone knows that plan and knows what to do, it's him. So we moved him back down to something that we felt like he could handle so we could keep a valued employee around. Now, there were other valued employees, by the way, that were in the same position as some of these others. Perry Jordan, who was another production manager, an African-American, who was written up, he was kept in his same position. And Clarence Granberry, who was another production manager, they were both kept and he was actually reassigned. So there was really, as the court did. Mr. Brown certainly wasn't somebody that was comparable. For argument's sake, you said Mr. Moore and him were comparable. Well, there was no racial animus because one was Caucasian and one was African-American. They were both terminated, by the way. Mr. Moore was replaced by an African-American. There were numerous people that were terminated, both African-American and Caucasian, during that period of time. The one thing that has not been presented in this case, and that is any evidence of any racial animus. Now, they've argued that the termination was, they didn't think it was right. But under the case law, the court doesn't set up as some type of super personnel department to decide whether or not the decision is correct. As a matter of fact, the district court indicated that while the decision may or may not have been correct, it was clearly a business decision and there was no racial animus, no racial component to the case. Now, I guess the bottom line here is that Mr. Beasley was the person who was And that continued to happen. And he was written up along with everybody else. And then termination was to terminate him, clearly. There was a business reason for that. This company was fighting for its life. He wasn't the only one terminated. And again, in the entire record, there's absolutely nothing showing any type of racial animus or anything that gives rise to discrimination. And unless you all have any more questions, I'll yield the rest of my time. Thank you. Very well. Thank you, Mr. Frye. Ms. Campbell, I believe you have some rebuttal time. There was a question asked about the ISO audit. In the ISO audit, part of the ISO audit required that customer satisfactory matrix go out to the customers. Mr. Beasley received a 4.5 out of 5 from the customers, and that was on APP 608. So there was no way if the customers rated his performance as 4.5 out of 5 points that this audit was not going to result in them losing their ISO qualification. So I wanted to address that with the court. Mr. Brown was the reason why the products were defective. He was not driving these procedures to ground with his employees. And upper management obviously saw that he was not doing what he was supposed to be doing. You can put all of the best laid plans into effect, but if you don't have the managers there that's responsible on a day-to-day operational basis to make sure that that product is serviced properly, then you will have some defects. But the Apple League has not presented any complaint from any customer after June 2015. There has been no complaint from any customer after Mr. Brown was put on a performance improvement program. Everything started to flow when Mr. Brown was removed from the production manager, and he was moved to the warehouse, which left Mr. Beasley there. In effect, he became the de facto production manager once they moved Mr. Brown to the warehouse. So he was running everything. He was running quality. He was running production, and no defects. So therefore, there was no justification. It was pretext to terminate this man from his employment while you uphold a man that's been there for 30 years and you've moved him from place to place to place. And the production manager was high up on the ladder of management. He was at the same management level as Mr. Beasley, and he did not lose any money. He did not lose any seniority. He kept his position, and Mr. Beasley was fired. And I believe that that's discrimination in the terms and conditions of employment. Thank you. Thank you, Ms. Campbell. Are you done? Yes, sir. Okay, thank you. We appreciate counsel's appearance today and briefing and arguments and cases submitted. We'll decide it in due course. Thank you.